UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.                                   ) | CRIMINAL ACTION |
| )                                       | No. 05-10165-RGS |
| ANTONIO GORDON           ) | |

### DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE – COUNT TWO

Now comes the Defendant, Antonio Gordon, and respectfully moves that this Court suppress any and all evidence derived from the pursuit, stop, detention, search and/or seizure of his person on or about May 3, 2005. In support thereof, defendant states that this was a warrantless search and no valid exception to the warrant requirement applies. Therefore, this stop, search and seizure violated the Fourth Amendment of the United States Constitution.

### I - STATEMENT OF RELEVANT FACTS

#### The Government's Version of the Defendant's Seizure

The following facts are derived from a May 3, 2005 Lynn police report. On May 3, 2005 the Lynn Police Department responded to 32 A Morris Street, Lynn, Massachusetts concerning a fight. On arrival the Lynn Police observed several male individuals in the driveway. The officer

-1-

observed one black male begin to run from this location as they pulled up. The officer immediately recognized this male as Antonio Gordon. The officer exited the cruiser and yelled "Hey Antonio hold up." Antonio yelled back "Why are you stopping me?" The officer told the defendant they were responding to a fight and wanted to find out what was going on. The officer approached the defendant and Mr. Gordon told the officer, he was harassing him." Mr. Gordon "then attempted to run away." Two police officers stopped the defendant and the defendant reached for his waistband. The officer grabbed his hand and felt a hard object sticking out of his waistband of his pants which the officer believed was a gun. The defendant began to struggle and resist and the officers pinned the defendant's arms behind his back. Officer Castle reached under the defendant's shirt and seized a loaded .22 caliber Smith & Wesson firearm.

### Antonio Gordon's Version of the Defendant's Seizure

The following facts are derived from the Affidavit of Antonio Gordon in Support of Defendant's Motion to Suppress, some of which is based on the 911 Tape provided by the Government. On May 3, 2005 the Lynn Police Department responded to 32 A Morris Street, Lynn for a possible disturbance. The 911 Tape reveals that the caller reported, "they're all fighting & brawling out there, they're supposed to be moved out by May 1st and they're still here, there is a party going on, need to break it up and quiet it down, the people in the neighborhood are complaining." Also, the caller states, "when you guys show up, they'll all stop" to which the Police Dispatcher stated, "I'm sure."

The overall context of the 911 Tape reveals a general disturbance as opposed to a specific fight. In fact, the fight was between two females, Erin and Elaine who were being loud. The

caller does not describe any suspect by race, age, height, weight, gender, clothing, etc. No crime involving Mr. Gordon was ever reported, nor was Mr. Gordon's name even mentioned during the call. Mr. Gordon was not involved in any alleged disturbance, in any way whatsoever.

When the police arrived they observed several individuals in the driveway, Mr. Gordon had already started to walk, not run, away from the area, and he was not one of the individuals in the driveway. The officer shouted things such as, "Come here Gordon" "What's going on" "Hold up Antonio" and Mr. Gordon responded, "I don't know, I didn't do nothing, I'm leaving." As Mr. Gordon attempted to leave the area, the Lynn police stopped him from doing so. Mr. Gordon attempted to leave the area more than once. There were a number of police cars and armed police officers present that physically prevented him from leaving by grabbing him. Mr. Gordon was searched for no reason and a .22 Smith & Wesson was seized along with six (6) .22 caliber shells. The defendant did not consent to this warrantless stop, search and/or seizure.

## II – ARGUMENT

Warrantless searches and seizures are presumptively unreasonable. Coolidge v. New Hampshire, 403 U.S. 443 (1971) ("searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions. The exceptions are 'jealously and carefully drawn' and there must be 'a showing by those who seek exemption that the exigencies of the situation made the course imperative.') The initial seizure of the defendant was undertaken without either an arrest warrant or a search warrant. Accordingly, the government bears the burden of demonstrating that the warrantless searches were permissible

under a recognized exception to the warrant and probable cause requirements of the Fourth Amendment.

In addition, the officers lacked probable cause, or reasonable grounds to believe that the defendant was committing, had committed, or was about to commit a crime. Moreover, at the time of the stop, there was no evidence that the defendant was armed and dangerous. Terry v. Ohio, 392 U.S. 1 (1968). Therefore, the government cannot bear its burden of proving the seizure and search of the defendant was justified by any recognized exception to the warrant requirements of the Fourth Amendment. Coolidge v. New Hampshire, 403 U.S. 443 (1971).

While the Fourth Amendment protects against unreasonable search and seizures, not all encounters between law enforcement officers and citizens constitute seizures. "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." U.S. v. Drayton, 536 U.S. 194, 200-201 (2002); U.S. v. Young, 105 F.3d 1, 6 (1st Cir. 1997). As the Supreme Court has found, it is only when a citizen's freedom of movement is objectively restrained that there is any foundation for invoking constitutional safeguards. U.S. v. Mendenhall, 446 U.S. 544, 553 (1980). As such, law enforcement officers are free to ask to examine a person's airline ticket, Florida v. Rodriquez, 469 U.S. 1, 5-6 (1984)(per curiam); ask for identification, U.S. v. Collis, 766 F.2d 219, 221 (6th Cir. 1985); and even enter someone's home. U.S. v. Garcia, 339 F.3d 116, 119-120 (2nd Cir. 2003).

However, the "stop" of Mr. Gordon was not permissible under the warrant exception set forth in Terry v.Ohio. In Terry, the Supreme Court held that "a police

<s>officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest." Terry at 22. The Terry exception is warranted when the officer can "point to specific and articulable facts which, taken together with rational inferences derived from those facts, reasonably show that an investigatory stop [is] warranted." U.S. v. Maguire, 359 F.3d 71, 76 (1st Cir. 2004).</s>

Police officers may conduct a brief investigatory stop of a suspect if they have reasonable suspicion, based on articulable facts, that a crime is about to be, or has been committed. Terry v. Ohio, 392 U.S. 1, 30 (1968); United States v. Golab, 325 F.3d 63, 66 (1st Cir. 2003). Determining whether a reasonable suspicion exists requires an objective inquiry. Bolton v. Taylor, 367 F.3d 5, 7 (1st Cir. 2004). An "inchoate and unparticularized suspicion or 'hunch' of criminal activity is insufficient. Terry, 392 U.S. at 27. Reasonable suspicion is evaluated in the context of the totality of the circumstances and demands a "practical, commonsense approach." United States v. Sowers, 136 F.3d 24, 28 (1st Cir. 1998).

This court must determine whether the officers' actions in stopping Mr. Gordon, were justified at their inception and whether the actions taken were "reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officers during the stop." United States v. Maguire, 359 F.3d 71, 76 (1st Cir. 2004) (internal quotation omitted). An officer may draw on his "own experience and specialized training to make inferences from and deductions about the cumulative information ... that might well elude an untrained person." United States v. Arvizu, 534

U.S. 266, 273 (2002) (citations and internal quotation omitted).

The fundamental holding of Terry is that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." Id. at 22. In order to justify a *Terry-type* search, the officer who conducted the search "must be able to articulate something more than an inchoate and unparticularized 'hunch.' United States v. Sokolow, 490 U.S. 1, 7 (1989). In evaluating the constitutional propriety of a *Terry-type* stop, courts apply a two-prong test. United States v. Owens, 167 F. 3d 739, 748 (1st Cir. 1999). The Court must "first determine whether the officer['s] actions were justified at [their] inception, and if so whether the actions undertaken by the officer[s] following the stop were reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officer[s] during the stop." United States v. Trueber, 238 F.3d 79, 92 (1st Cir. 2001). "The first part of the inquiry is satisfied if the officers can point to specific and articulable facts which, taken together with rational inferences derived from those facts, reasonably show that an investigatory stop was warranted." United States v. Maguire, 359 F. 3d 71, 76 (1st Cir. 2004). (Citations omitted) (local police responding to a dispatch of an armed bank robbery encountered the disheveled defendant emerging from the back yard of a private residence in the vicinity of where the suspected stolen getaway car was found abandoned).

The warrant and probable cause requirements are not excused under Terry v. Ohio. A warrantless search is permissible under the Terry standard only where a law enforcement officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." 392 U.S. 1 at 30 (1968). If that condition is met, the officer is

-6-

permitted to do no more than "briefly stop the suspicious person and make reasonable inquiries aimed at confirming or denying his suspicions." Id. The officer making the stop "must be able to articulate something more than an inchoate and unparticularized suspicion or 'hunch'" linking an individual to criminal activity. United States v. Sokolow, 490 U.S. 1, 7, (1989) (citation and some internal quotation marks omitted). This means that some of the facts on which the officer relies must be particular, that is, specific to the individual. See United States v. Cortez, 449 U.S. 411, 418 (1981); Terry, 392 U.S. at 21 n.18; United States v. Proctor, 148 F.3d 39, 42 (1st Cir. 1998). Consequently, the proper focus for evaluating the sufficiency of evidence of reasonable suspicion centers upon the objective significance of the particular facts under all the circumstances. See, e.g., Reid v. Georgia, 448 U.S. 438, 441 (1980) (per curium).

Here, even under the government's version of events, at the time the officer approached the defendant, began asking questions and then searched him, he knew only that the defendant was attempting to leave the area. There is nothing unusual or potentially criminal about that, and certainly nothing implicating the defendant in criminal activity. The circumstances cited by the officers were simply not enough to turn a hunch into reasonable articulable suspicion. See United States v. Woodrum, 202 F.3d 1, 13 (1st Cir. 1997) (while facts such as high crime area and the hour of night may put officers on their guard, they cannot, without more, be grounds for detaining). Consequently, under all of the circumstances, the officers' detention and searches of the defendant were unreasonable and the fruits of those searches must be suppressed.

In light of the factual assertions set forth in Mr. Gordon's Affidavit, the stop of the defendant was not reasonable at its inception. There were no obvious signs that he had committed, was committing, or was about to commit a crime. For example, he was not brandishing a weapon of

any kind. At the point of the seizure, the officer had no evidence to believe reasonably that the defendant had committed any crime; thus, there was no need to detain him. Therefore, it is clear that the officer's actions were unreasonable at their inception.

The second prong of the Court's analysis is consideration of "whether the scope of the investigatory stop was reasonable under the circumstances." <u>United States v. Maguire</u>, supra at 77; <u>United States v. Trueber</u>, supra. *Assuming arguendo* that the officer's initial actions toward the defendant were constitutionally justified, the government yet cannot prove that his actions undertaken thereafter "were reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officer[s] during the stop." <u>United States v. Trueber</u>, supra.

"Limited searches of a person for weapons are constitutionally permissible adjuncts to a <u>Terry</u> stop if 'a reasonably prudent man in the circumstances would be warranted in the belief that his safety or the safety of others was in danger.'" <u>United States v. Nee</u>, 261 F. 3d 79, 83 (1st Cir. 2001) (Quoting <u>Terry v. Ohio</u>, supra at 27). At the point at which the officer conducted the pat-frisk of the defendant, the only information he had in his possession was that the defendant was trying to leave the area. The defendant was not obviously armed and was not acting in a threatening, or aggressive manner. The officer had no information that the defendant was armed and dangerous, or that he was wanted on outstanding criminal charges. In short, all the officer knew was that the defendant was walking on a public street trying to leave the area. This is simply not enough to warrant a reasonably prudent man in the officer's position believing that his safety or the safety of others was in question.

<u>Terry</u> and its progeny permit investigative detentions of persons where reasonable

suspicion of criminal behavior exists. However, the exception created for Terry stops was never meant to displace or challenge the core right of all persons to avoid police encounters where objective evidence of criminality is lacking to warrant an intrusion upon one's liberty and personal security. Indeed, since Terry, the Court has spoken with one voice and left no doubt that individuals have an affirmative right to avoid police contact and that the exercise of that right, by itself, cannot justify an investigative detention.was in danger so as to warrant a pat-frisk for weapons.

### A. ABSENT OBJECTIVE EVIDENCE OF CRIMINALITY, INDIVIDUALS HAVE AN AFFIRMATIVE RIGHT TO AVOID THE POLICE, AND SUCH AVOIDANCE CANNOT BE USED TO JUSTIFY AN INVESTIGATIVE DETENTION.

Freedom of movement is an established right that dates back to the common law era. Under our Constitution, all persons possess an unqualified right to stand or move about on the streets free of arbitrary and discretionary police restraint. Fourth Amendment cases have recognized that, absent reasonable suspicion of crime, a person has an affirmative right to avoid police contact, and the exercise of that right cannot be used to justify an investigative detention.

The right to avoid police contact does not turn on the manner in which one exercises that privilege. The United States Supreme Court has never questioned the right to avoid police encounters. Anticipating the Government's argument, the Government should not be allowed to argue that conduct that merely avoids the police is constitutionally protected, however, flight from the police is suspicious and justifies an immediate detention. This distinction is unsound as a normative matter because there is no "police-approved" method of exercising the right to avoid

police contact. Flight alone can not constitute reasonable suspicion for it will mean that a person who wants to prevent a police encounter ab initio cannot immediately and unequivocally indicate his desire to avoid the police without being detained.

It is well established that individuals enjoy the rights of freedom of movement and personal security while on the streets. William Blackstone described the privilege this way: "This personal liberty consists in the power of locomotion, of changing situation, or removing one's person to whatsoever place one's own inclination may direct; without imprisonment or restraint, unless by due course of law." 1 William Blackstone, Commentaries on the Laws of England 134 (1783).

Fourth Amendment jurisprudence also recognizes that pedestrians are guaranteed the right to move about the streets free of police interference. "This inestimable right of personal security belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs." Terry v. Ohio, 392 U.S. 1, 8-9 (1968). Chief Justice Warren's majority opinion in Terry noted the common law origins of this right:

> No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.

Terry, 392 U.S. at 9, quoting Union Pac.R.Co. v. Botsford, 141 U.S. 250, 251 (1891).

Prior to Terry, police could not seize an individual unless they possessed probable cause to arrest the person.₁ Terry created an exception to the traditional probable cause rule. It held

---

that, where an officer reasonably believes that criminal conduct "may be afoot" and that a suspect "may be armed and presently dangerous," an officer may frisk the suspect for weapons. Terry, 392 U.S. at 31.2  Although this expansion of police power -- the so-called Terry stop and frisk -- constituted a significant change in Fourth Amendment doctrine, Chief Justice Warren emphasized that the Court was not retreating from the constitutional norm that citizens were free to come and go as they pleased without official restraint or interference, unless objective evidence warranted a police intrusion. Id. at 21-22. 3

Significantly, other members of the Terry Court stressed that the scope of the Fourth Amendment's protection for pedestrians was not limited to the concept of freedom from arbitrary restraint. The amendment also protected the right to avoid police contact ab initio. Justice Harlan explained that although a police officer (like every other citizen) is free to address questions to persons standing on the street, the pedestrian is free to disregard the police inquiry and move on. Id. at 32-33 (Harlan, J., concurring)("the person addressed [by a police officer] has an equal right to ignore his interrogator and walk away"). Justice White also emphasized that a pedestrian is under no obligation to cooperate with the police. A person approached by the

---

1 See Dunaway v. New York, 442 U.S. 200, 207-09 (1979); Florida v. Royer, 460 U.S. 491, 498 (1983)(plurality opinion).

2 The term "reasonable suspicion" was not used by the Terry majority. "[N]owhere in Chief Justice Warren's opinion will you find the words 'reasonable suspicion' that have come to exemplify the Terry standard. Instead, the opinion carefully employs and adapts the language of Brinegar v. United States, [338 U.S. 160 (1949)], the classical statement of the probable cause standard, while recognizing that officers may conduct protective searches when possessed of a lesser quantum of information." Earl C. Dudley, Jr., "Terry v. Ohio, The Warren Court, and The Fourth Amendment: A Law Clerk's Perspective," 72 St. John's L.Rev. 891, 896 (1998)(footnotes omitted); 4 Wayne F. LaFave, Search and Seizure s 9.5(a) at 251 (3d ed. 1996)(same). It was in later cases that the Court began using the term "reasonable suspicion" to describe the quantum of evidence needed to justify an investigative detention of a person. See United States v. Brignoni-Ponce, 422 U.S. 873, 881-84 (1975); Brown v. Texas, 443 U.S. 47, 52-53 (1979).

3 Brinegar v. United States, 338 U.S. 160, 177 (1949)("[T]he citizen who has given no good cause for believing he is engaged in [criminal] activity is entitled to proceed on his way without interference")(footnote omitted); Carroll v. United States, 267 U.S. 132, 154 (1925)("[T]hose lawfully within the country [are] entitled to use the public highways [and] have a right to free passage without interruption or search unless there is known to a competent official authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise").

police has the right to avoid a police encounter and the right to leave the scene. Id. at 34 (White. J.,concurring) ("Absent special circumstances, the person approached [by an officer] may not be detained or frisked but may refuse to cooperate and go on his way").

Since Terry. the United States Supreme Court has repeatedly recognized. without dissent, that absent reasonable suspicion, the Fourth Amendment grants individuals an affirmative right to avoid police encounters and move on. Moreover, the choice to refuse police contact cannot be used as a bootstrap to justify an investigative stop. Brown v. Texas, 443 U.S. 47 (1979).

In Brown, police officers physically detained Brown to determine his identity, after Brown refused the officers' request to identify himself. Brown and another man were observed walking in opposite directions from each other in an alley in an area known for high narcotics traffic. An officer testified that he and his partner believed the two men "had been together or were about to meet until the patrol car appeared." Id. at 48. The officers stopped Brown because "the situation 'looked suspicious and [they] had never seen [Brown] in that area before.'" Id. at 49. Brown refused to identify himself and angrily asserted that the police had no right to stop him. Id. A unanimous Court held that, because the officers lacked reasonable suspicion that Brown was involved in criminal conduct, detaining him to ascertain his identity violated the Fourth Amendment.

Similarly, in Florida v. Royer, 460 U.S. 491 (1983), no member of the Court expressed disagreement with Justice White's conclusion that a person approached by the police has a fundamental right to withhold his cooperation and "go on his way." Justice White explained:

> The person approached ... need not answer any question put to him; indeed, he
> may decline to listen to the questions at all and may go on his way. He may not be

detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds.

Id. at 497-98 (citations omitted). 4

Additionally, in Florida v. Bostick, 501 U.S. 429 (1991), Justice O'Connor reaffirmed the norm announced in Brown and Royer that citizens are under no obligation to tolerate police inquiries and retain the right to refuse cooperation with legitimate law enforcement practices. Bostick ruled that police questioning of a passenger on a bus does not automatically constitute a seizure under the Fourth Amendment. Although police questioning is permitted without reasonable suspicion, Justice O'Connor was careful to point out that an individual cannot be penalized for refusing to cooperate with the police. "We have consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." Id. at 437 (citations omitted).

## B. THE RIGHT TO AVOID POLICE CONTACT DOES NOT TURN ON THE MANNER IN WHICH ONE EXERCISES THAT PRIVILEGE.

Because the United States Supreme Court has never questioned an individual's right to avoid police contact, the government should not be allowed to draw a distinction between conduct that "simply avoids the police," and a decision to "take flight," which the government may argue justifies an investigative stop. Unless reasonable suspicion exists, the Fourth Amendment provides individuals the affirmative right to avoid police contact. The defendant in

---

4 See also United States v. Mendenhall, 446 U.S. 544, 553-54 (1980) (opinion of Stewart, J., joined by Rehnquist, J.)(recognizing that no seizure occurs within the meaning of the Fourth Amendment "[a]s long as the person to whom questions are put remains free to disregard the questions and walk away"); cf. INS v. Delgado, 466 U.S. 210, 216-17 (1984)(opinion of Rehnquist, J., for the majority)(While concluding that police questioning, by itself, does not implicate the Fourth Amendment, "if the person refuses to answer and the police take additional steps -- such as [detaining him] -- to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure").

-13-

Brown v. Texas did not "simply refuse[] to cease or modify his behavior in response to police entreaties." Rather, Brown discernibly altered his conduct, and tried (unsuccessfully) to avoid police officers who were approaching him. See 443 U.S. at 48 ("Although [Brown and another man] were a few feet apart when they first were seen, Officer Venegas later testified that both officers believed the two had been together or were about to meet until the patrol car appeared").

Supreme Court cases have never suggested that the right to avoid police contact turns on the manner in which one exercises that privilege. Nor has the Court indicated that the choice to exercise the privilege can be second-guessed by police officers. For example, in Brown v. Texas, if Brown had moved more quickly and eluded the officers in the alley, a later detention of Brown after the police caught up with him would have also violated the Fourth Amendment. Or, in Bostick, if instead of listening to the officers' questions and agreeing to a consent search of his luggage, Bostick had abruptly left his seat and headed for the restroom, or hurriedly departed the bus, the officers still would have lacked reasonable suspicion for a detention. This is because there is no "police-approved" method of exercising the right to "move on." Nor is there a constitutionally prescribed way to signal that one intends to "decline" all police inquiries and intends to "go on his way." Royer, 460 U.S. at 498. Where reasonable suspicion of criminality is lacking, "the balance between the public interest and [the individual's] right to personal security and privacy tilts in favor of freedom from police interference." Brown v. Texas, 443 U.S. at 52.[5]

The government's anticipated position would eventually overwhelm the right to avoid police contact. If the government suggests that "flight" or "running away" (defendant disputes

---

5 See e.g., Reid v. Georgia, 448 U.S. 438, 441 (1980)(per curiam) (officer's belief that defendant and his companion were attempting to conceal the fact that they were traveling together is insufficient to justify seizure)(citation omitted); Brown v. Texas, 443 U.S. at 49 (officer's testimony that suspect looked suspicious and had never been seen before does not constitute reasonable suspicion); Sibron v. New York, 392 U.S. 40, 62 (1968)(although officer testified he approached and searched Sibron because he saw Sibron in the company of known narcotics addicts over an eight-hour period, "the inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security").

-14-

running and states "walking") from the police is innately suspicious then what if, instead of "running away" the defendant immediately jumped on his bicycle and pedaled away, or hurriedly entered a taxi waiting at a taxi-stand and told the driver to leave? Both movements could be considered "flight." Or, what if the defendant, after noticing the police, immediately turned around and entered the next door building? To the typical officer, riding away on a bike, entering a car and driving off, or disappearing inside a building, in response to approaching officers is likely to be seen as the equivalent of "flight" or "running away," and thus, justify a seizure. If these choices warrant a detention, then the right to avoid police has been reduced to a privilege only to "walk away" from the police in an orderly manner.

In summary, the right to avoid police contact is an affirmative right. Its existence does not turn on the manner in which one exercises that privilege, nor does it require police approval that the decision to shun approaching officers seemed more like "avoidance" than "flight." The personal security guaranteed by the Fourth Amendment should not turn on such standardless judgments that are bound to yield unprincipled results and are too easily subject to abuse by the officer in the field. As Justice Kennedy noted in another context, "[l]iberty comes not from officials by grace but from the Constitution by right." Maryland v. Wilson, 519 U.S. 408, 424 (1997)(dissenting opinion). Put another way, a right that is sometimes not a right is no right at all.

C. **FLIGHT FROM THE POLICE CANNOT JUSTIFY A DETENTION; OTHERWISE, A PERSON'S RIGHT TO AVOID POLICE CONTACT IS MEANINGLESS.**

Brown v. Texas, Royer and Bostick recognize that, unless reasonable suspicion exists, all

persons retain a fundamental right to refuse cooperation with the police, to avoid police questions, and to terminate police encounters. One commentator has aptly explained why, if flight alone is grounds for a detention, the right to avoid police contact is illusory for someone who wants to prevent a police encounter from the beginning: [I]ndividuals have a right to avoid answering police questions where detention is not justified. Implicit in that right is the right to avoid being questioned in the first place. To require a person to wait for a police officer to approach before turning away would suspend the individual's right to go on his way from the time he became aware of the officer's approach [or presence] until some magic moment when the right reappeared.6

Several courts have ruled that allowing officers to forcibly detain a person because of flight "belies the proposition that citizens are free to ignore police." Id. at 223.7 By holding that flight alone cannot justify a detention, the ruling below reaffirms what Justices Harlan and White stated explicitly in Terry, and what is implicit in Brown v. Texas, Royer and Bostick: Because there is no obligation to respond to police inquiries, it follows a fortiori that the otherwise nonsuspicious person who immediately and unequivocally indicates his desire to avoid the police cannot be detained.8   There may be many reasons the defendant wanted to avoid police contact.9

---

6 Rachel A. Van Cleave, "Michigan v. Chesternut and Investigative Pursuits: Is There No End to the War Between the Constitution and Common Sense?," 40 Hastings L.J. 203, 216 (1988).

7 FN18. See, e.g., State v. Tucker, 642 A.2d 401, 408 (N.J.Sup.Ct. 1994); People v. Holmes, 619 N.E.2d 396, 397 (N.Y.Ct.App. 1993); State v. Hicks, 488 N.W.2d 359, 363 (Neb.Sup.Ct. 1992); People v. Shabaz, 378 N.W.2d 451, 460 (Mich.Sup.Ct. 1985); People v. Thomas, 660 P.2d 1272, 1275 (Colo.Sup.Ct. 1983)(en banc); Watkins v. State, 420 A.2d 270, 274 (Md.Ct.App. 1980).

8 See also 3 Wayne F. LaFave, Search and Seizure s 8.1 at 597, n.9 (refusal to consent to a search, by itself, cannot constitute reasonable suspicion justifying a Terry stop)(citing cases); Rachel Karen Laser, "Unreasonable Suspicion: Relying on Refusals to Support Terry Stops," 62 U.Chic.L.Rev. 1161, 1178 (1995) ("Th[e] 'right' to refuse [a consent search] is undermined, however, if the exercise of that right can be used against a person").

## The Defendant was seized within the meaning of the Fourth Amendment.

To determine whether a particular police-citizen encounter constitutes a seizure implicating the Fourth Amendment, the First Circuit applies a fact-specific inquiry into whether a reasonable person would have felt free to leave and terminate the encounter. See United States v. Cardoza, 129 F.3d 6, 14-15 (1st Cir. 1997)(citing Florida v. Bostick, 501 U.S. 429, 439 (1991)); United States v. Young, 105 F.3d 1, 5-6 (1997). The analysis "considers the totality of the circumstances particular to each encounter." United States v. Cardoza, 129 F.3d at 15. In United States v. Mendenhall, 446 U.S. 544 (1980), Justice Stewart wrote that examples of circumstances that might indicate a seizure include "the threatening presence of several officers,

---

9 See, e.g., Editorial, "For Some Running Away Not Suspicious But Rational: Fleeing From A Police Officer Should Not Be The Sole Basis For A Search," Portland Press Herald (Maine), May 11, 1999 (noting that recent incidents of racial profiling by the police "show that some officers will react differently to people depending on their skin color or age. For someone who has had that experience, running away at the sight of police wouldn't be suspicious behavior, it would be sensible"); Richard W. Stevenson, "Los Angeles Chief Taunted at Hearing: U.S. Plans Wide Inquiry on Brutality," N.Y. Times, Mar. 15, 1991, at A16 (quoting California Assemblyman Curtis Tucker saying after the Rodney King beating: "When black people in Los Angeles see a police car approaching, 'They don't know whether justice will me meted out or whether judge, jury and executioner is pulling up behind them'").

Recently, the New Jersey Attorney General acknowledged that "minority motorists have been treated differently [by New Jersey State Troopers] than nonminority motorists during the course of traffic stops on the New Jersey Turnpike." According to the Attorney General, "the problem of disparate treatment is real -- not imagined." Interim Report of the [New Jersey] State Police Review Team Regarding Allegations of Racial Profiling 8 (1999). The Attorney General noted that such treatment "leaves persons of color with a sense of powerlessness, hostility, and anger." Id. at 41.

The Wall Street Journal described the fear and anger in the black community of Dayton caused by the tactics of an anti-drug police task force. See Alex Kotlowitz, "Drug War's Emphasis On Law Enforcement Takes a Toll on Police," Wall Street Journal, Jan. 11, 1991, at A1 ("Black leaders complained that innocent people were picked up in the drug sweeps .... Some teenagers were so scared of the task force they ran even if they weren't selling drugs"). The Journal reported that one officer "once whacked a fleeing suspect across the forehead with an aluminum flashlight. Another time he shoved a drug suspect against the van, shattering a window. 'If [a suspect] ran and got caught, he took an ass-whipping'").

See Report of the Attorney General's Civil Rights Division On Boston Police Department Practices 36-46 (1990)(Mass. Report)(detailing allegations of illegal searches); Commonwealth v. Phillips and Woody, No. 080275-6, Memorandum and Order (Suffolk Sup.Ct. Sept 17, 1989)(ruling that a police directive that all known gang members and their associates would be searched on sight was "a proclamation of martial law in Roxbury for a narrow class of people, young blacks, suspected of membership in a gang or perceived by the police to be in the company of someone thought to be a member"); Peter S. Canellos, "Youths Decry Search Tactics," Boston Globe, Jan. 14, 1990, at 1 (describing how black youths were stopped, frisked, and strip searched by police without reasonable suspicion of crime).

After investigating charges that the Boston Police Department had repeatedly searched persons without cause, the Massachusetts Attorney General concluded:
> We conclude that Boston police officers engaged in improper, and unconstitutional, conduct in the 1989-90 period with respect to stops and searches of minority individuals in the Roxbury, Dorchester, and Mattapan communities .... We do not credit all of the allegations of all of the complainants. However, these allegations are widespread, common in nature, in some cases supported by witnesses, and consistent with other information we have received. Although we cannot say with precision how widespread this illegal conduct was, we believe that it was sufficiently common to justify changes in Department practices. Mass. Report at 60.

-17-

the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or a tone of voice indicating that compliance with the officer's request might be compelled." 446 U.S. at 554 (opinion of Stewart, J.).

The circumstances surrounding defendant's encounter with the Lynn police demonstrate that defendant was seized within the meaning of the Fourth Amendment prior to the officers' search or observations concerning a gun, regardless of which version of that encounter this Court adopts. At the point where the Lynn police officer exited the cruiser and told the defendant to "hold up", which is prior to the search – the defendant was seized within the meaning of the Fourth Amendment. This was not a police-citizen encounter where the officers merely rolled down their window and asked defendant for a moment of his time. Compare United States v. Cardoza, 129 F.3d 6, 14-15 (1st Cir. 1997)(no seizure where officers in unmarked car pulled over to curb; rolled down window and asked the defendant "what's up?"; and defendant turned and approached patrol car); United States v. Young, 105 F.3d 1, 5-6 (1997)(no seizure where officers pulled cruiser to curb alongside the defendant; rolled window down and asked defendant if he had a minute to speak with them; and defendant said "sure"). Rather, this was a circumstance where the threatening presence of several officers, some physical touching of the person of the citizen, and the use of language or a tone of voice indicating that compliance with the officer's request was compelled. Mendenhall, 446 U.S. at 554.

Under either version of the encounter with the Lynn police, defendant's seizure before any police search is patent. By the officer's own statement when he got out of his cruiser, he immediately approached and attempted to stop the defendant without any knowledge that he had committed or was committing any criminal offense. Mr. Gordon attempted to walk away and

was prevented and chased. Certainly under these circumstances defendant would not have felt free to terminate his encounter with any of the police officers.

### The Defendant Did Not Consent to Any Searches.

At no time did the defendant consent to the search of his person. Indeed, he was not given so much as the opportunity to consent, but was immediately searched by the officer. Nor did the defendant "consent" to a search of his person by acquiescing to the officer's behavior. In fact, he tried to prevent himself from being frisked.

It is well settled that consent given after an illegal search and seizure is invalid. See, e.g., Florida v. Royer, 460 U.S. 491, 501 (1983); United States v. Valdez, 931 F.2d 1448, 1452 (11th Cir. 1991). Additionally, the officer never advised the defendant that he could withhold consent for a search. That, when combined with other improprieties such as occurred here, has been held to invalidate consent. See United States v. Jones, 846 F.2d 358, 361-61 (6th Cir. 1988).

For these reasons, the search of the defendant and seizure of the gun from the defendant indisputably constitutes a search, without consent, and is contrary to the Fourth Amendment.

## III. FRUITS OF THE ILLEGAL STOP AND/OR SEARCH MUST BE SUPPRESSED

Where, as here, an individual has been illegally seized the court is required to determine whether evidence discovered must be suppressed as fruit of the illegal detention. If the evidence was obtained by exploitation of the violation of the defendant's Fourth Amendment rights, then the evidence must be suppressed. Wong Sun v. United States, 371 U.S. 471, 485 (1963); Hicks v. United States, 705 A.2d 636, 639-640 (D.C. 1997).

Here, the gun was found as a direct consequence of the stop and/or frisk and/or search and seizure by the police which exceeded the scope legally permissible when stopping and restraining the defendant. Furthermore, the actions undertaken by the officers following the stop were not reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officers during the stop. See <u>United States v. Sowers</u>, 136 F.3d 24, 27 (1st Cir. 1998). Therfore, the seizure of the gun and any other evidence obtained during the stop and detention was a fruit of the primary illegality and must be suppressed. <u>Wong Sun v. United States</u>, 371 U.S. 471, 485 (1963); <u>Hicks v. United States</u>, 705 A.2d 636, 639-640 (D.C. 1997). See also <u>United States v. Acosta-Colon</u>, 157 F.3d 9 (1st Cir. 1998) (baggage claim tickets that defendant tried to swallow constituted fruit of illegal detention); LaFave, SEARCH AND SEIZURE, § 2.6(b), at 584-85 (3rd ed. 1996). ("Where a person has disposed of property in response to a police effort to make an illegal seizure . . . courts have not hesitated to hold that property inadmissible." (footnotes omitted)).

## IV - CONCLUSION

For the foregoing reasons, the defendant respectfully moves that this Court suppress from evidence at trial a gun and any other items allegedly observed or seized during a warrantless search and seizure of him on May 3, 2005.

Respectfully submitted,

/s/ Glen P. Randall
Glen P. Randall
BBO#: 563472
Murphy & Randall, LLP
50 Burlington Mall Road, Suite 100
Burlington, MA 01803
Tel.: (781) 238-0300